Harsha, J.
{¶ 1} After a jury convicted Franklin S. Woods of one count of rape and five counts of gross sexual imposition, the trial court sentenced him to prison. Initially Woods asserts that the trial court erred by denying his motion to suppress his statements to a children's services supervisor and a deputy sheriff.
{¶ 2} Woods claims the statements were obtained through an impermissible two-step interrogation technique in which the children's services supervisor, who was also a part-time police officer, interrogated Woods without any Miranda warnings, and the deputy sheriff subsequently interrogated him after he administered Miranda warnings. We reject Woods's assertion because he was not in custody when *590 he answered questions from the children's services supervisor, who was not acting in his capacity as a police officer or as an agent of the police. Because Woods was not subjected to custodial interrogation without Miranda warnings, this case does not involve the impermissible, two-step, question-first interrogation technique.
{¶ 3} Next Woods contends that the trial court erred in denying his motion to suppress his statement to the deputy sheriff, who did Mirandize him, because the deputy failed to scrupulously honor Woods's assertion of his right to remain silent. Because the record does not establish that Woods unequivocally invoked his right to remain silent, the trial court did not err by denying his motion to suppress.
{¶ 4} Finally, Woods argues that his convictions for rape and gross sexual imposition were not supported by sufficient evidence and were against the manifest weight of the evidence because the jury rejected specific events but convicted him on more general allegations. But Woods's daughter testified that he had touched her breasts more than ten times before she reached age 13, and he touched the inside of her vagina every time he came into her room both before and after she was 13. Woods also admitted his inappropriate sexual contact with his daughter to two children's services employees and a deputy sheriff. This provided sufficient evidence to support his convictions. And the jury did not clearly lose its way or create a manifest miscarriage of justice by convicting him of the crimes, so the weight of the evidence supports his conviction.
{¶ 5} We reject Woods's argument and affirm his convictions.
I. FACTS
{¶ 6} In Case No. 15CR301, the state filed an information charging Franklin S. Woods with one count of gross sexual imposition. In Case No. 16CR33, the Lawrence County Grand Jury returned an indictment charging Woods with six counts of rape, eight counts of gross sexual imposition, and four counts of sexual battery. After the court consolidated the cases for purposes of trial, Woods filed a motion to suppress the statements he made to a children's services social worker, the social worker's supervisor, and a deputy sheriff.
A. Suppression Hearing
{¶ 7} At the suppression hearing the state introduced the testimony of social worker Amber Stamper, a social worker with the Lawrence County Department of Job & Family Services, Adult Protective Service Division, and her supervisor, Randy Thomson. Stamper is not a police officer and does not wear a badge or gun; although she works primarily with adults, she is sometimes assigned to assist in the management of cases involving children.
{¶ 8} On November 16, 2015, Stamper began investigating a case of sexual abuse of M.W., Woods's minor daughter. Initially Stamper went to the middle school and interviewed M.W. about her allegations against Woods. Lawrence County Deputy Sheriff Scott Wilson, the school's resource officer, was present for the child's interview. Following that interview Stamper attempted to contact Woods and his fiancée, Samantha Best, but was unsuccessful. She then arranged for the temporary placement of M.W. with Best's mother, Yvette.
{¶ 9} The next day, November 17, 2015, Woods called Stamper, who said she needed to speak with him about his daughter's general allegations, and to complete a required safety plan. Woods told her that he was more than willing to meet her at her office and that he was going to be very cooperative.
{¶ 10} That afternoon Woods appeared at the Lawrence County Department of *591 Job & Family Services, a two-story office building with an entry containing a reception window and a waiting area. A door from the reception area leads to a hallway with three conference rooms. To enter the hallway, the door must be electronically unlocked, but there is no lock preventing persons from leaving the hallway, conference rooms, and building.
{¶ 11} Stamper met Woods in the reception area and took him to the first conference room, where they went over the terms of the safety plan, which addressed the sexual-abuse allegations. The conference room was eight by ten feet, with a desk and chairs behind, in front of, and on the side of the desk. The door, which had a small window in it, was closed but not locked. Woods sat behind the desk facing the door, and Stamper sat in front of the desk. Stamper testified that nothing prevented Woods from getting up and walking out the door and leaving the building; his demeanor was nervous, but very cooperative.
{¶ 12} Stamper did not notify Woods of specific allegations; she only told him that his daughter had indicated he touched her inappropriately. According to Stamper, after learning of his daughter's claims, Woods said he was "not denying" the allegations. Woods never indicated that he wanted to leave, and if he had, Stamper would have let him go because the agency "cannot force them to stay." But Stamper admitted that she never told Woods that he did not have to answer her questions and that he was free to leave.
{¶ 13} After Woods signed the safety plan, Stamper told him that her supervisor was coming down to sign it. Stamper left the conference room and called the supervisor, Randy Thompson, whose office is on the second floor of the building.
{¶ 14} Thompson is a supervising social worker for the Lawrence County Department of Job & Family Services. Upon learning that Woods did not deny his daughter's allegations, Thompson brought a device to record his interview, which lasted about 25 minutes. Thompson testified that during the interview Woods was free to leave at any time, was not under arrest, and had not been told that he could not leave. According to Thompson although the door to the conference room was closed, it was not locked, and Woods was positioned in a way that he could have gotten by Thompson to leave the room. Woods never asked to leave, never stated that he did not want to talk to Thompson, and never asked for an attorney. Because Woods was not in custody and Thompson was acting as a social worker, Thompson did not administer Miranda warnings before interviewing him.
{¶ 15} Although he is also a part-time village police officer, Thompson stated he did not enjoy county-wide police powers and was not working as a police officer during the interview. He was not wearing a uniform or badge, and did not have a gun or handcuffs during the interview. Near the beginning of his interview Thompson informed Woods that he and Stamper were "not police officers here." Thompson testified that he had no prior arrangement or contact with law enforcement relating to his investigation or his conversation with Woods; instead, he and his agency were following its statutory duty to investigate M.W.'s claimed allegations of child sex-abuse. No law enforcement officer was present during the interview; only Thompson, Woods, and Stamper were there.
{¶ 16} Near the beginning of the interview, Woods asked Thompson whether "[y]ou got to do this?"; Thompson responded that "[w]e don't have to do it, but I mean, we like to know what's going on." Woods then said that he was embarrassed and ashamed, that he was "scared for this *592 process, scared to go to prison," but that he did not want to "drag her through trial" and that he wanted his family to be placed with his fiancée's mother while they all undergo counseling. During the interview Woods was remorseful and admitted inappropriately touching his daughter on her breast about seven times, rubbing her vagina, and "[m]aybe" putting his fingers between the lips of her vagina. He also said that although he did not recall licking her daughter's vagina, he would "admit to [and] say she's telling the truth." Woods eventually admitted that he got sexually aroused when he touched his daughter's breasts.
{¶ 17} Upon the conclusion of the 25-minute interview, Thompson contacted Lawrence County Deputy Sheriff Brian Chaffins, who came to the agency office. Deputy Sheriff Chaffins did not have any prior knowledge about the allegations or investigation. He met with Thompson for about "five or ten seconds," after Thompson advised him he had an individual who had made statements about sexually abusing a child. Deputy Sheriff Chaffins got his digital recording device, started it, and went to the conference room with Thompson to interview Woods.
{¶ 18} About 45 minutes had elapsed between Thompson's questioning and Deputy Sheriff Chaffins's interview of Woods, who was left alone in the room; no one prevented him from leaving the building during that time. Chaffins testified that although he did not place Woods under arrest at the start of his interview, he notified Woods of his Miranda rights. Woods stated that he understood those rights.
{¶ 19} Chaffins first asked Woods to describe "what's going on." Although it is difficult to hear, the taped recording appears to reveal Woods's response was: "I said everything I needed to say already. I'm under arrest. I've already said everything. Am I under arrest?" The deputy sheriff responded that he was just there to question Woods to get his side of the story and proceeded to ask questions.
{¶ 20} According to Deputy Sheriff Chaffins, Woods voluntarily spoke to him, never invoked his right to remain silent or asked for an attorney, never stated that he wanted to stop, appeared to be apologetic, and was very cooperative during the interview. Woods admitted to everything in his previous statement to Thompson, including that he fondled his daughter's breasts, put his hand down her panties, and licked her vagina. Most of the interview involved the deputy questioning Woods, but near the end, the deputy let Thompson ask some questions. After the interview concluded, Sgt. Chaffins arrested Woods.
{¶ 21} Woods did not present any witnesses or evidence at the suppression hearing, but both parties submitted posthearing briefs.
B. Ruling on Motion to Suppress
{¶ 22} The trial court denied Woods's motion to suppress. The court found that Woods made three incriminating statements-the first to social worker Stamper, the second to social worker supervisor Thompson, and the third to Deputy Sheriff Chaffins. Based on the evidence before it, the trial court concluded that: (1) Woods's first two statements did not require Miranda warnings because they were not made to law enforcement officers engaged in custodial interrogation; (2) Thompson had no police powers outside Proctorville and there was no evidence that he acted as a police officer during his interview of Woods; (3) the final statement to Deputy Sheriff Chaffins was valid because Woods made it after receiving his Miranda rights and making a knowing waiver of those rights; and (4) based on the validity of the first two statements, this case did not involve *593 the illegal two-step interrogation technique.
C. Jury Trial and Sentencing
{¶ 23} At the jury trial the victim M.W., testified that beginning in the second grade the family lived in a trailer in Chesapeake, Ohio where her father, Woods, began touching her breasts. The family consisted of Woods, his daughter, M.W., Woods's fiancée, Samantha Best, Best's young daughter, Natalie, and Woods's and Best's twin sons. When she was in seventh grade, the family moved to a house down the road from the trailer.
{¶ 24} According to M.W., Woods would come into her room at night when she was asleep, and she would wake up when he was either rubbing or putting his mouth on her breasts. M.W. testified that before she reached 13, her father touched her breasts "to[o] many times to count" and "more than ten times." She further testified that Woods touched inside her vagina with his hand or finger every time he came into her room, both before and after she was 13. And Woods also licked her vagina every time he came into her room after she reached 13.
{¶ 25} M.W. also testified about two specific incidents. In the first incident, before she was 13, she woke up one night in her bedroom and Woods was touching her breasts. M.W. kept telling him to get off, and he then grabbed her and took her to the kitchen and put her against a stone wall, where he stuck his hand in her panties and his finger in her vagina.
{¶ 26} In the second incident, when she was 13, M.W. woke up in her room when Woods was licking and kissing her vagina. She started kicking him, and the wheels on the bed made it slide until a mirror behind her bed fell, resulting in a noise that woke up Woods's fiancée, Samantha. Woods told M.W. that he wanted to smash her face, but he returned to his room.
{¶ 27} The evidence indicated that in the fall of 2015 a counselor at M.W.'s middle school learned that M.W. was talking to one of the teachers and was upset. The counselor met with M.W., who was crying uncontrollably and told the counselor that her father was hurting her. The counselor notified Lawrence County Department of Job & Family Services, which dispatched social worker Amber Stamper to speak with M.W. Stamper and the school resource officer, Lawrence County Deputy Sheriff Scott Wilson, talked with M.W. Stamper reported to her supervisor, Randy Thompson, who instructed her to begin working on a safety plan for the child. Stamper contacted Woods's fiancée, Samantha Best, who M.W. considered her mother or stepmother. They agreed Best should take the child to Best's mother, Yvette's, residence until an investigation was finished.
{¶ 28} The next day Woods called Stamper, who explained that M.W. had made allegations of inappropriate touching against him, so she needed Woods to come to her office to sign a safety plan. Woods came to the office that afternoon. When Stamper reviewed the safety plan with him, Woods stated that "he was not denying the allegations" his daughter made against him. After they completed reviewing the safety plan, Stamper left the room and called Thompson, the supervisor of the Child Protective Unit at the Lawrence County Department of Job & Family Services, which investigates allegations of child sexual abuse, as required by law. Thompson picked up his recording device, turned it on, and interviewed Woods, who admitted that he sexually abused his daughter. More particularly, Woods said that he had inappropriately touched his daughter on her breast about seven times, rubbed her vagina, "[m]aybe" put his fingers between the lips of her vagina, and *594 that M.W. was telling the truth about him licking her vagina.
{¶ 29} Thompson then contacted Lawrence County Deputy Sheriff Brian Chaffins, who recorded an interview with Woods. After Chaffins administered Miranda warnings, Woods admitted sexually abusing M.W. According to Thompson, Woods did not appear to be under the influence of alcohol, medication, or substance of abuse. And Deputy Sheriff Chaffins testified that Woods did not appear confused or impaired.
{¶ 30} On direct examination Woods denied that he ever engaged in any inappropriate touching or sexual contact or conduct with his daughter. He testified that he suffers from bipolar depression and anxiety. After he was informed by his fiancée of his daughter's allegations against him, he stayed up all night drinking beer, smoking marijuana, and taking a double dose of his prescription medication. Woods indicated he lied to Stamper, Thompson, and Deputy Sheriff Chaffins because he was not sober, and he thought that by admitting to his daughter's allegations he would protect her and end the questioning.
{¶ 31} Samantha Best, Woods's fiancée, and her mother, Yvette, testified that M.W. admitted to them that part of her allegations against Woods were lies. Along with Woods's sister, Betty Layman, they testified that M.W.'s home was so full of people living there that her claims of inappropriate sexual behavior could not have occurred without being observed.
{¶ 32} The jury returned verdicts finding Woods guilty of five counts of gross sexual imposition of a child less than 13 years of age in violation of R.C. 2907.05(A)(4), a third-degree felony, and one count of rape of a child less than 13 years of age in violation of R.C. 2907.02(A)(1)(b), a first-degree felony. The jury found him not guilty of the remaining counts, including the counts relating to the specific incidents regarding the kitchen and the falling bedroom mirror. The trial court sentenced him to an aggregate prison term of 32.5 years to life.
II. ASSIGNMENTS OF ERROR
{¶ 33} Woods assigns the following errors for our review:
I. THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO SUPPRESS WHEN APPELLANT'S STATEMENT WAS OBTAINED THROUGH A TWO-STEP INTERROGATION TECHNIQUE PROHIBITED BY THE SUPREME COURT IN MISSOURI V. SEIBERT .
II. THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO SUPPRESS WHEN DEPUTY CHAFFINS FAILED TO "SCRUPULOUSLY HONOR" APPELLANT'S ASSERTION OF HIS RIGHT TO REMAIN SILENT.
III. APPELLANT'S CONVICTION WAS BASED ON INSUFFICIENT EVIDENCE.
IV. APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
III. LAW AND ANALYSIS
A. Motion to Suppress
1. Standard of Review
{¶ 34} In his first and second assignments of error Woods asserts that the trial court erred in denying his motion to suppress statements he made to social worker supervisor Thompson and Deputy Sheriff Chaffins. Appellate review of a trial court's decision on a motion to suppress raises a mixed question of law and fact. State v. Hobbs , 133 Ohio St.3d 43, 2012-Ohio-3886, 975 N.E.2d 965, ¶ 6. Because *595 the trial court acts as the trier of fact in suppression hearings and is in the best position to resolve factual issues and evaluate the credibility of witnesses, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. State v. Burnside , 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. Accepting these facts as true, we must then "independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." Hobbs at ¶ 8, citing Burnside at ¶ 8.
2. Two-Step Interrogation Technique
{¶ 35} First Woods asserts that the trial court erred in denying his motion to suppress because his statements to Thompson and Deputy Sheriff Chaffins were inadmissible as part of the two-step interrogation technique prohibited by the United States Supreme Court in Missouri v. Seibert , 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). The plurality in Seibert held that a "midstream recitation of [Miranda] warnings after interrogation and unwarned confession" does not "comply with Miranda's constitutional requirement." Id. at 604, 124 S.Ct. 2601. In that case a police officer intentionally questioned a defendant at a police station following her arrest without providing Miranda warnings. During this questioning the defendant made incriminating statements. The officer then gave the defendant a 20-minute break. After the break the same officer gave the defendant Miranda warnings, obtained a signed waiver, and resumed questioning. During this second round of questioning the officer confronted the defendant with the prewarning statements. The defendant repeated her incriminating statements.
{¶ 36} The court referred to the police officer's "midstream" warning as a specifically designed police strategy of "question-first." Id. at 609-611, 124 S.Ct. 2601. The court determined that "[t]he object of question-first is to render Miranda warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." Id. at 611, 124 S.Ct. 2601. After an objective determination from the perspective of the suspect about whether Miranda warnings delivered midstream could be effective enough to accomplish their purpose, the plurality held that the defendant's postwarning statements were inadmissible. Id. at 615-616, 124 S.Ct. 2601. The Supreme Court of Ohio applied Seibert in State v. Farris , 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985.
{¶ 37} But before we apply Seibert , we must first decide whether Woods made his prewarning statement to Thompson in the context of a custodial interrogation by a law enforcement officer or agent. If Woods was not subjected to custodial interrogation, Miranda warnings were not necessary, making Seibert and Farris inapplicable. See State v. Martin , 151 Ohio St.3d 470, 2017-Ohio-7556, 90 N.E.3d 857, ¶ 105-106.
{¶ 38} In Miranda v. Arizona , 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court established procedural safeguards for securing the constitutional privilege against self-incrimination. Id. To protect this right the court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda at 444, 86 S.Ct. 1602.
{¶ 39} The key issue in this case is whether Woods was in custody when Thompson questioned him. Custodial *596 interrogation is that "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda at 444, 86 S.Ct. 1602 ; Cleveland v. Oles, 152 Ohio St.3d 1, 2017-Ohio-5834, 92 N.E.3d 810, ¶ 9. " 'Custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." Howes v. Fields , 565 U.S. 499, 508-509, 132 S.Ct. 1181, 182 L.Ed.2d 17 (2012). In determining whether a person is in custody, courts must examine all the circumstances surrounding the interrogation to ascertain whether a reasonable person would have felt at liberty to terminate the interrogation and leave. Id. "The ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler , 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983), quoting Oregon v. Mathiason , 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). "The relevant inquiry in determining whether a person is subject to custodial interrogation focuses upon how a reasonable person in the suspect's position would have understood the situation[;] [t]he subjective views of the interviewing officer and the suspect do not control whether a custodial interrogation occurred." State v. Fouts , 4th Dist. Washington No. 15CA25, 2016-Ohio-1104, 2016 WL 1071457, ¶ 19.
{¶ 40} Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning. See Howes at 509, 132 S.Ct. 1181 ; State v. Edmond , 10th Dist. Franklin No. 15AP-574, 2016-Ohio-1034, 2016 WL 1051181, ¶ 12.
{¶ 41} The trial court refused to suppress Woods's statement to Thompson, finding it was not the product of custodial interrogation. The trial court relied upon the following facts: (1) Woods had returned a phone call to the social worker, Stamper; (2) he voluntarily came to the social worker's office building; (3) there were no locked doors preventing Woods from leaving at any time he wished to; and (4) he was never told he was not free to leave.
{¶ 42} Woods asserts that the trial court's factual finding that he came to the department of job and family services building voluntarily was not supported by the evidence because he only appeared after Stamper told him that he would need to sign a safety plan before M.W. could return to him. But he cites no testimony or other evidence from the suppression hearing establishing that Stamper threatened him with permanent removal of his daughter and other children if he failed to come in to sign the safety plan. In fact his daughter had already left his home through placement with his fiancée's mother when Stamper talked to him. And Woods told Thompson that he wanted his children to be placed there at least temporarily. The trial court's findings were supported by the evidence at the suppression hearing.
{¶ 43} The relevant circumstances include: (1) Thompson's interrogation occurred at a county department of job and family services office building rather than a police station; (2) Woods voluntarily came to the building at the social worker's request; (3) the interrogation was brief-lasting only about 25 minutes; (4) Woods indicated a willingness to talk freely about his daughter's allegations of sexual abuse because he did not want to drag his daughter through a trial and he was remorseful and ashamed about what he had done to *597 her; (5) he was not physically restrained during the interrogation and he was free to leave at any time during it or during the 45-minute break before Deputy Sheriff Chaffins arrived; and (6) Thompson expressly told him during the interview that they did not "have to do" the interview.
{¶ 44} Moreover, when he interrogated Woods, Thompson was not acting in his capacity as a police officer or an agent of the police. The trial court concluded that although Thompson was also a part-time village police officer, he had no police powers outside the village, and there was no evidence that Woods had any knowledge that Thompson was also a police officer. The trial court's findings were supported by Thompson's testimony at the suppression hearing, as well as his statement to Woods during the interview, that neither he nor Stamper were police officers. Although counsel speculates that Woods could have known Thompson to be a police officer because of where he lived, there is nothing in the suppression hearing that supports this speculation. Consequently, a reasonable person in Woods's position would not have believed that Thompson, who was acting as a social worker supervisor, and was not dressed in a police uniform with a badge or gun, was a police officer.
{¶ 45} Although Miranda 's requirements clearly apply to persons acting as agents of law enforcement, see State v. Phillips, 4th Dist. Highland No. 11CA11, 2011-Ohio-6773, 2011 WL 6930202, ¶ 9, we are not persuaded that Thompson and Stamper acted in that capacity while interviewing Woods. Children's services agencies like the Lawrence County Department of Job & Family Services have a statutory duty to investigate any complaint concerning child abuse. Their investigators and employees are required to attempt to interview alleged perpetrators in child abuse cases and to report all known and suspected child abuse to law enforcement. State v. Kessler , 12th Dist. Fayette No. CA2005-12-037, 2007-Ohio-1225, 2007 WL 805612, ¶ 19, citing R.C. 5153.16(A).
{¶ 46} Ohio courts have consistently held that in general, children services case workers and employees are not considered law enforcement officers and consequently have no duty to advise suspects of their Miranda rights. Id. ; State v. Coonrod , 12th Dist. Fayette No. CA2009-08-013, 2010-Ohio-1102, 2010 WL 1019586, ¶ 9, quoting State v. Thoman , 10th Dist. Franklin No. 04AP-787, 2005-Ohio-898, 2005 WL 488390, ¶ 7 ("In general, Ohio courts have held that 'social workers have no duty to provide Miranda warnings because they are private individuals without the power to arrest' "). The Supreme Court of Ohio recently adopted this general precept by holding that "[a] social worker's statutory duty to cooperate and share information with law enforcement with respect to a child abuse investigation does not render the social worker an agent of law enforcement for purposes of the Fifth and Sixth Amendments to the United States Constitution when the social worker interviews an alleged perpetrator unless other evidence demonstrates that the social worker acted at the direction or under the control of law enforcement." State v. Jackson , 154 Ohio St.3d 542, 2018-Ohio-2169, 116 N.E.3d 1240, syllabus. Here, Woods relies upon Thompson's dual employment as a social worker and police officer to distinguish Jackson.
{¶ 47} Under limited circumstances appellate courts have upheld trial court determinations that a social worker was acting as an agent of law enforcement for purposes of custodial interrogation, thus requiring Miranda warnings. See, e.g., State v. Brown , 91 Ohio App.3d 427, 632 N.E.2d 970 (6th Dist.1993) (defendant was *598 coerced and in custody during interview at department of human services where DHS social worker told the defendant that his stepdaughter would be removed from his home if he did not attend interview, a 6'5" police officer dominated and controlled the interview by moving to a position no more than a few inches away from him, the interview lasted more than an hour, which created an intimidating atmosphere in which a reasonable person would not have felt free to leave); State v. Torres , 67 Ohio App.3d 268, 586 N.E.2d 1153 (6th Dist.1990) (defendant was in custody for purposes of Miranda warnings when, after agreeing to interview on allegations that he had sexual contact with a minor, he was taken to a private room at the department of human services by an agency representative and an investigator for the prosecutor, who were acting as an arm of the police department in an atmosphere that was police dominated).
{¶ 48} These cases, which Woods relies upon, are easily distinguishable. There was no evidence at the suppression hearing-as in Brown -that the social worker threatened removal of the child from his home; the child had already been removed as Woods himself argued was advisable. Nor was the interrogation dominated by either a large, intimidating uniformed police officer or a prosecutor's investigator-as in Brown and Torres. And significantly, the trial court here did not find a coercive, custodial atmosphere. See State v. Walker , 10th Dist. Franklin No. 97AP02-212, 1997 WL 578946, *7 (Sept. 16, 1997) (distinguishing Brown because the trial court in that case determined that there was an in-custody, police dominated atmosphere surrounding the interview, whereas the trial court in Walker did not).
{¶ 49} Notwithstanding Thompson's position with an uninvolved law enforcement agency, this is not a case in which "other evidence" demonstrates that the social workers acted at the direction or under the control of law enforcement. Jackson at syllabus. Instead, there is no evidence here that Thompson or Stamper acted at the direction, control, or behest of law enforcement. Under these circumstances, we agree with the trial court's conclusion that they were not agents of law enforcement so as to warrant Miranda warnings.
{¶ 50} Because the trial court correctly held that Woods was not in custody when Thompson interrogated him, it properly rejected Woods's claim that the state had engaged in the impermissible two-step interrogation technique prohibited in Seibert , 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643, and Farris , 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985. Unlike the defendants in those cases, Woods had not been arrested or taken into custody by police when he was initially interrogated.
{¶ 51} Finally, Woods claims that the trial court's findings regarding the statements he made to social worker Stamper were factually inaccurate and not supported by the record. The state does not deny that the trial court's findings were inaccurate, but argues that the error was harmless. The trial court erroneously found that Woods made statements admitting specific instances of sexual abuse to Stamper; he actually made these statements to Thompson. He only told Stamper he was not denying her general summary that his daughter had indicated he was inappropriately touching her.
{¶ 52} Nevertheless, we agree with the state that this mistake was harmless because the trial court's suppression ruling was not dependent on when Woods made more detailed incriminating statements. The trial court's conclusion that Woods was not subjected to custodial interrogation when he spoke to Stamper and *599 Thompson was not dependent on that fact. Therefore, we overrule Woods's first assignment of error.
3. Right to Remain Silent
{¶ 53} In his second assignment of error Woods contends because the deputy failed to scrupulously honor his assertion of his right to remain silent, the trial court erred when it denied his motion to suppress his statement to Deputy Sheriff Chaffins. Neither party disputes that the deputy administered Miranda warnings to Woods before questioning him and Woods acknowledged that he understood them. Instead the dispute is about whether Woods clearly invoked his right to remain silent during the interrogation.
{¶ 54} "Invocation of the Miranda right to [remain silent] 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire [to cease all questioning].' " Davis v. United States , 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), quoting McNeil v. Wisconsin , 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). "If the suspect's statement is not an unambiguous or unequivocal [invocation of the right to remain silent], the officers have no obligation to stop questioning him." Davis at 461, 114 S.Ct. 2350. " 'If an accused makes a statement concerning the right to [remain silent] 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wanted to invoke his or her Miranda rights.' " State v. Lawson , 4th Dist. Pickaway No. 14CA20, 2015-Ohio-4394, 2015 WL 6395932, ¶ 19, quoting Berghuis v. Thompkins , 560 U.S. 370, 381, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010).
{¶ 55} Woods asserts after being Mirandized and acknowledging his waiver, Deputy Sheriff Chaffins asked him "what's going on." Although the state's transcript of the statement listed Woods's response as partly unintelligible, Woods claims he responded that "he had already provided a statement to Thompson, that he believed himself to be under arrest, and that he had nothing to say." Thus he contends questioning should have stopped.
{¶ 56} Our own review of the audio recording of Woods's statement to the deputy reveals the following dialogue:
Chaffins: Do you care to talk about what's going on?
Woods: I said everything I needed to say already. I'm under arrest. I've already said everything. Am I under arrest?
Chaffins: I'm just here to question you. That's it. I don't know what's going on. All I know is your daughter made an allegation and children services were trying to clear that up and then I have been brought into the mix of it. I'm here to get your side of the story. I haven't talked to your daughter yet. I talked briefly to children services but not enough to get the whole story. I just wanted to see what your, a lot of times it's easier to just cut to the chase and talk to the person directly.
{¶ 57} Woods then proceeded to answer additional questions from the deputy and Thompson.
{¶ 58} Our review of the recording does not support Woods's claim that he told the deputy that he "had nothing to say." At best, he referenced his previous statement to Thompson by indicating that he had "already said everything." But he tied that answer to a question about whether he was under arrest.
{¶ 59} Woods's statement was comparable to a "suspect expressing a desire not to elaborate on a prior answer because he had nothing else to say about *600 it," which is not tantamount to unequivocally invoking the right to remain silent and to terminate the interview. See, e.g, State v. Gray , 2017-Ohio-563, 85 N.E.3d 316, ¶ 11 (2d Dist.), and cases cited. Similarly, in State v. Griffith , 11th Dist. Trumbull No. 2001-T-0136, 2003-Ohio-6980, 2003 WL 22994540, ¶ 34, the court determined that the defendant did not unambiguously invoke his right to remain silent by stating, "I'm done," because in the context of the questioning, it "could have meant that [defendant's] previous answer was complete and that he had nothing to add to that answer," but "did not clearly display [his] intention to not answer subsequent questions."
{¶ 60} The record does not support Woods's claim that he unequivocally invoked his right to remain silent during his interview with Deputy Sheriff Chaffins. The deputy was not required to stop questioning him or even clarify whether he wished to continue answering questions. Lawson , 2015-Ohio-4394, at ¶ 33. We overrule Woods's second assignment of error.
B. Sufficiency and Manifest Weight of the Evidence
1. Standard of Review
{¶ 61} In his third and fourth assignments of error Woods asserts that his convictions for rape and gross sexual imposition were not supported by sufficient evidence and were against the manifest weight of the evidence.
{¶ 62} "When a court reviews the record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " State v. Maxwell , 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 146, quoting State v. Jenks , 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
{¶ 63} "A sufficiency assignment of error challenges the legal adequacy of the state's prima facie case, not its rational persuasiveness." State v. Koon , 4th Dist. Hocking No. 15CA17, 2016-Ohio-416, 2016 WL 527289, ¶ 17. "That limited review does not intrude on the jury's role 'to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " Musacchio v. United States , --- U.S. ----, 136 S.Ct. 709, 715, 193 L.Ed.2d 639 (2016), quoting Jackson at 319, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.
{¶ 64} By contrast in determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. State v. Thompkins , 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997) ; State v. Hunter , 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119.
{¶ 65} "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence." Thompkins at 387, 678 N.E.2d 541. However, we are reminded that generally, the weight and credibility of evidence are to be determined by the trier of fact. See State v. Kirkland , 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, at ¶ 132. " 'A jury, sitting as the trier of fact, is free to believe *601 all, part or none of the testimony of any witness who appears before it.' " State v. Reyes-Rosales , 4th Dist. Adams No. 15CA1010, 2016-Ohio-3338, 2016 WL 3216241, ¶ 17, quoting State v. West , 4th Dist. Scioto No. 12CA3507, 2014-Ohio-1941, 2014 WL 1875931, ¶ 23. We defer to the trier of fact on these evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility. Id. ; Koon at ¶ 18.
2. Analysis
{¶ 66} In his third assignment of error Woods claims that his convictions for one count of rape and five counts of gross sexual imposition of a child less than 13 years of age were not supported by sufficient evidence.
{¶ 67} Woods was convicted of rape in violation of R.C. 2907.02(A)(1)(b), a felony of the first degree, which states: "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." " 'Sexual conduct' means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A).
{¶ 68} He was also convicted of gross sexual imposition under R.C. 2907.05(A)(4), which states: "[n]o person shall have sexual contact with another, not the spouse of the offender * * * when * * * [t]he other person * * * is less than thirteen years of age, whether or not the offender knows the age of that person." " 'Sexual contact' means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907. 01(B).
{¶ 69} Woods argues that because the jury found him not guilty of the counts that were based upon two fact-specific incidents involving the kitchen and bedroom mirror, it could not convict him of the counts based upon more general factual assertions. He contends "[a]t least some specifics regarding where and when an alleged assault occurred, and what specific actions occurred that constitute an offense, are required to prove beyond a reasonable doubt that [he] is guilty of an offense."
{¶ 70} However the law is clear that testimony regarding the exact date and time of an offense is not required in these cases. That is, "[a]n allowance for reasonableness and inexactitude must be made for such cases because many child victims are unable to remember exact dates and times, particularly where the crimes involve a repeated course of conduct over an extended period of time and the accused and the victim reside in the same household, which facilitates the extended period of abuse." See, generally, State v. Neal , 2016-Ohio-64, 57 N.E.3d 272, ¶ 24 (4th Dist.), citing State v. Adams , 2014-Ohio-5854, 26 N.E.3d 1283, ¶ 51 (7th Dist.) ; see also State v. Wright , 2d Dist. Clark No. 99CA0011, 2000 WL 679142, *5 (May 26, 2000) (rejecting appellant's argument that his convictions for gross sexual imposition were not supported by sufficient evidence because the child victim "never provided any specific dates or times when these offenses occurred"). In these cases, the state need only "establish that the offense charged occurred within a reasonable *602 time in relation to the dates fixed in the indictment." Neal at ¶ 24 (stating this precept in the context of addressing an insufficient-evidence claim); State v. McIntire, 6th Dist. Huron No. H-13-018, 2015-Ohio-1057, 2015 WL 1278645, ¶ 42, citing State v. Dodson, 12th Dist. Butler No. CA2010-08-191, 2011-Ohio-6222, 2011 WL 6017950, ¶ 40 ; see also State v. Green, 4th Dist. Ross No. 04CA2760, 2004-Ohio-5089, 2004 WL 2260508, ¶ 16 ("the prosecution was not required to prove the exact date of the offense because the date is not an element of the offense. However, the prosecution is required to prove beyond a reasonable doubt that the incident occurred within the time frame specified in the indictment").
{¶ 71} This case involved Woods's repeated sexual abuse of his minor daughter over an extended period of time while they lived in the same household. The particulars of the crimes were supported by sufficient evidence. The child victim testified that Woods touched her breasts more than ten times and touched the inside of her vagina every time he came into her bedroom before she was 13. And Woods admitted inappropriate sexual behavior with his daughter to Stamper, Thompson, and Deputy Sheriff Chaffins. He also admitted to being sexually aroused when he touched his daughter's breasts. After viewing this evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crimes of rape and gross sexual imposition of a child less than 13 years of age proven beyond a reasonable doubt. We overrule Woods's third assignment of error.
{¶ 72} In his fourth assignment of error Woods argues that his convictions for rape and gross sexual imposition were against the manifest weight of the evidence. He claims that the child victim's testimony about him committing these crimes was inconsistent and contradicted by the testimony of Betty Layman, Yvette Best, and Samantha Best. He also argues that his daughter's testimony is not credible because she testified that Woods did not sexually abuse her when he lived with her on two occasions in Columbus with no one else around, but sexually abused her in Lawrence County when there were as many as seven other people in the small house.
{¶ 73} We reject Woods's argument given the deference we accord to the jury's resolution of these weight and credibility issues. The jury was in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility. Kirkland , 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, at ¶ 132. Significantly, M.W.'s allegations against Woods were supported by Woods's own statements to Stamper, Thompson, and Deputy Sheriff Chaffins. Although Woods claimed at trial that he was impaired by lack of sleep and self-medication when he admitted to sexually abusing his daughter, the state presented evidence by Thompson and Chaffins that Woods did not appear impaired or confused when he conceded his criminal behavior. The jury did not clearly lose its way or create a manifest miscarriage of justice by finding him guilty of rape and gross sexual imposition. Consequently, his convictions were not against the manifest weight of the evidence. We overrule Woods's fourth assignment of error.
IV. CONCLUSION
{¶ 74} Woods has not established any reversible error by the trial court in overruling his motion to suppress. Nor has he established that his convictions for rape and gross sexual imposition were not supported by sufficient evidence or against the manifest weight of the evidence. Having *603 overruled Woods's assignments of error, we affirm the judgment of the trial court.
JUDGMENT AFFIRMED.
Hoover, P.J. & Abele, J.: Concur in Judgment & Opinion.