[Cite as *In re D.L.*, 2016-Ohio-5834.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 103553**

# IN RE: D.L.
# A Minor Child

## JUDGMENT:
REVERSED AND REMANDED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. DL15103037

**BEFORE:** Kilbane, J., E.A. Gallagher, P.J., and Stewart, J.

**RELEASED AND JOURNALIZED:** September 15, 2016

**ATTORNEY FOR APPELLANT**

Dale M. Hartman
2195 South Green Road
Cleveland, Ohio 44121


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
Vencot Brown
Assistant County Prosecutor
The Justice Center - 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

MARY EILEEN KILBANE, J.:

**{¶1}** Appellant, D.L., appeals from an order of the Cuyahoga County Court of Common Pleas, Juvenile Division, adjudicating him delinquent by reason of rape. D.L. raises a single assignment of error, contending that his delinquency adjudication was against the manifest weight of the evidence. For the reasons set forth below, we reverse the decision of the juvenile court and remand for further proceedings.

**{¶2}** In April 2015, the state of Ohio filed a delinquency complaint against D.L., age 17, charging him with one count of rape and three counts of gross sexual imposition ("GSI"). The complaint lists K.M., also age 17, as the victim. The matter proceeded to an adjudicatory hearing in July 2015, at which the following evidence was adduced.

**{¶3}** D.L. and K.M. met each other through social media around August 2014. They attended different schools. Both K.M. and D.L. were involved in their respective schools and good students. D.L. had a four-year scholarship to college. Sometime after August 2014, K.M. met D.L. for the first time in person at a basketball game. Then in early October 2014, D.L. visited K.M. at her home. While D.L. was there, he met K.M.'s parents, who were both home during the visit.

**{¶4}** D.L. was K.M.'s first boyfriend. K.M. told D.L. that her father does not like boys talking to her. In D.L.'s video-recorded statement to the police, which was admitted into evidence, D.L. told the detective that he felt "weird" and "scared" at K.M.'s house because her father was pacing back and forth and was following them while they

were talking outside by the lake behind her house. D.L. wanted to stay outside because K.M.'s parents were acting "fishy." Subsequently, he called his grandmother to pick him up from K.M.'s house.

{¶5} D.L. and K.M. then had a second date on October 14, 2014. On this date, K.M. visited D.L. at his home after dinner. K.M.'s mother dropped her off at D.L.'s home and asked to speak with D.L.'s father. D.L.'s father came outside and personally spoke with K.M.'s mother. The father told the mother that he would be home while K.M was there. D.L.'s father went into a room upstairs, and D.L. and K.M. went in D.L.'s bedroom, which was also upstairs and down the hall. They both sat on D.L.'s bed and watched a movie.[1] D.L.'s bedroom door was open. K.M. testified that at some point, D.L. left his bedroom, and when he returned, he shut his bedroom door. D.L. testified that his bedroom door was "cracked open" the entire time.

{¶6} While the two of them were talking, D.L. confirmed with K.M. that they were dating. K.M. testified that she wanted to be in a relationship with D.L. They stood up and started kissing. K.M. had her arms wrapped around D.L. K.M. testified that she was "okay" with the kissing, describing it as "what boys and girls do." They moved back onto D.L.'s bed. D.L. was touching K.M.'s, breasts, buttock, and thighs. K.M. testified that she began to feel "uncomfortable when it led to the bed." K.M. next testified that D.L. pulled down her pants and underwear. She was lying on her back, and D.L. was on

---

[1]In his statement to the police, D.L. stated that he has a "couch bed" and had it as a couch when K.M. was visiting.

top of her.  She testified that D.L. kept saying "I'm not going to do anything."  She then felt his penis enter her vagina.  At that point in time, K.M. thought "okay, I need to stop this."  She stated her thoughts:

> I had all these thoughts running through my head.  I'm like okay, I don't — I'm like — I was like I couldn't really say anything.  Like I tried to push him, but it's like, you know, he wasn't really moving.  He was like, I'm not going to do anything.  So I'm like okay, my mom is coming.

{¶7} K.M. testified that D.L. stopped when she told him that her mother was coming.  After that, K.M. pulled up her underwear and pants, and both of them went downstairs to play video games.

{¶8} In her video-recorded statement to the police, which was admitted into evidence, K.M. told the detective D.L. stopped after she told him that he had to stop.  At which point, she indicated that D.L. stopped and got off of her.

{¶9} D.L. testified that while they were in his bedroom, they started kissing and touching each other.  K.M. was touching his back and kissing his neck.  They went onto the bed and K.M. started to unbuckle her belt.  She then pulled down her pants.  D.L. testified that at this point in time, K.M. gave him no indication that she wanted to stop.  He then put the tip of his penis by K.M.'s vagina and K.M. said, "stop."  At that point, D.L. respected K.M.'s decision and got off of the bed.  D.L. testified that the only time K.M. said "stop" was when the tip of his penis was by her vagina.  After that, they went downstairs and played a video game.  He testified:

> [K.M.] wasn't telling me no or none of that.  She was just going with the flow.  And, you know, I'm just like, okay.  But, you know this is the same girl telling me that she was a virgin.  While we was doing all that, that was

shocking to me, like.   So I'm just thinking, okay, you know, maybe she lied to me or something, I don't know.   I'm just continuing doing, you know, boom.   Then I had — I took out my penis.   And as soon as I put it right there, like on the tip, she like nah.   She like nah, I ain't ready yet.   Nah, I ain't ready yet.   I looked at her.   I said, okay, I respect your decision.   I got up.   And she like — she got up.   She put her pants on.

And then I was like, let's go downstairs because ain't no point of just staying up her and teasing each other[.]

{¶10} In his statement to the police, D.L. said that while he and K.M. were kissing, she pulled down her pants.   He then got on top of her.   K.M. said she was not ready, so he respected her decision and got off of her.   He told the detective that he did not pull down his pants and his penis never touched K.M.'s vagina.   At trial, he testified that he was dishonest when he spoke with the detective because his was scared and nervous.   He told the detective that they did not have sex because it was just getting to that point.   Then, K.M. said "stop," so he stopped and they went downstairs.

{¶11} While they were playing the video game, K.M.'s mother arrived.   D.L. walked her to the door, where they talked and D.L. gave K.M. a hug.   While in the car together, K.M. told her mother that her time at D.L.'s house was fun.   She did not tell her mother any details about her visit with D.L.

{¶12} The next morning, K.M. woke up because she had to vomit.   K.M. texted D.L. later that day, letting him know that she had a stomach virus.   D.L. never responded to her text.   She initially thought she was sick from food she ate the night before.   She later found out that she was vomiting from being nervous about her visit with D.L.   She continued to vomit for three days.   At which point, her mother decided to take her to the

doctor. K.M. then told her mother about what transpired while she was at D.L.'s house. She testified that she told her mother because she thought she might be pregnant and did not want her parents to find out at the hospital. Her mother told her father, who was furious with K.M. Her father called D.L. about the incident. D.L. testified that K.M.'s father was yelling at him, telling him that his daughter did not want to sleep with him. In his statement to the police, D.L. stated that K.M.'s father told him "I'm on my way to your house." He also said that his daughter is a virgin. To which D.L. replied, "exactly, * * * you're right, she's a virgin, * * * we didn't do [any]thing." D.L. explained to the detective that he felt as though K.M.'s father was forcing her to accuse him of rape.

{¶13} At the hospital, a Sexual Assault Nurse Examiner ("SANE") nurse completed an exam. K.M. told the SANE nurse that she did not want to press charges against D.L. The Cuyahoga County Regional Forensic Laboratory completed DNA testing on the samples from the rape kit. Two types of DNA testing had to be completed in order to extrapolate a minute amount of DNA. Through the DNA test focusing solely on male DNA, the forensic scientist found a small amount of male DNA (seminal material) on K.M's underwear consistent with D.L.'s DNA profile.

{¶14} On August 19, 2015, the juvenile court adjudicated D.L. delinquent by reason of rape and dismissed the GSI counts. The court referred the matter to the probation department for a sex offender assessment. At the dispositional hearing on September 21, 2015, the court committed D.L. to the legal custody of the Department of Youth Services for an indefinite term of a minimum of 12 months and a maximum not to

exceed D.L.'s attainment of 21 years of age. The next day, D.L. filed his notice of appeal. The day after, on September 23, D.L. moved for a bond hearing pending appeal and requested a stay of his sentence pending appeal. That same day, the court held a hearing on D.L.'s motion. The trial court granted his bond request and issued a stay of his sentence pending his appeal.

{¶15} D.L. raises the following single assignment of error for review.

Assignment of Error

The verdict was against the manifest weight of the evidence.

{¶16} D.L. maintains that the incident involves two juveniles, both 17, who were sexually inexperienced. He argues that there is a conflict in the evidence as to when K.M. said "stop" and when D.L. stopped. As a result, he contends that the delinquency adjudication was against the manifest weight of the evidence.

{¶17} We recognize that "[w]here a trial is not to a jury, a majority of the Court of Appeals may reverse a judgment on the weight of the evidence." *State v. Gilkerson*, 1 Ohio St.2d 103, 104, 205 N.E.2d 13 (1965), citing *Hnizdil v. White Motor Co.*, 152 Ohio St. 1, 87 N.E.2d 94 (1949), and construing former Section 6, Article IV, of the Ohio Constitution, which is similar to the current version of Section 3(B)(3), Article IV.

{¶18} A manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion. *State v. Whitsett*, 8th Dist. Cuyahoga No. 101182, 2014-Ohio-4933, ¶ 26, citing *State v. Thompkins,* 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541; *State v. Bowden*, 8th Dist. Cuyahoga No.

92266, 2009-Ohio-3598, ¶ 13, citing *Thompkins*.   Because the standard of review is broader, a reviewing court may determine that a judgment of a trial court is sustained by sufficient evidence, but nevertheless conclude that the judgment is against the weight of the evidence.

{¶19} In discussing the manifest weight standard as explained in *Thompkins*, the Ohio Supreme Court stated:

> [T]he reviewing court asks whose evidence is more persuasive — the state's or the defendants?   * * * "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony."   [*Thompkins* at 387], citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.

*State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25.

{¶20} An appellate court may not merely substitute its view for that of the jury, but must find that "'in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"   *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).   Reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'"   *Thompkins* at 387, quoting *Martin* at 175.   We believe that this is such a case.

{¶21} The trial court adjudicated D.L. delinquent by reason of rape in violation of 2907.02(A)(2), which provides that "[n]o person shall engage in sexual conduct with

another when the offender purposely compels the other person to submit by force or threat of force."

{¶22} In the instant case, there is nothing in the record that would enable a trier of fact to reasonably conclude that D.L. engaged in sexual conduct with K.M. without her consent, while compelling her to submit to force or threat of force. Rather, the record reveals that K.M. and D.L. were inexperienced juveniles who engaged in consensual sexual activity. D.L. was K.M.'s first boyfriend. They were on their second date when the two of them began experimenting sexually in D.L.'s bedroom. The sexual activity began with kissing. K.M. was "okay" with this. It then progressed onto the bed. As it progressed, K.M. testified about the thoughts in her head. She stated, "I had all these thoughts running through [her] head. I'm like okay, I don't — I'm like — I was like I couldn't really say anything." Then she decided to say "my mom is coming." After she said that, D.L. stopped within a couple of seconds. K.M. further testified that the encounter did not last for very long — for "two minutes or so."

{¶23} D.L.'s testimony essentially corroborates K.M.'s testimony as to how the consensual sexual conduct progressed between the two of them and how D.L. stopped when K.M. said "stop." He testified that:

> [K.M.] wasn't telling me no or none of that. She was just going with the flow. And, you know, I'm just like, okay. But, you know this is the same girl telling me that she was a virgin. While we was doing all that, that was shocking to me, like. So I'm just thinking, okay, you know, maybe she lied to me or something, I don't know. I'm just continuing doing, you know, boom. Then I had — I took out my penis. And as soon as I put it right there, like on the tip, she like nah. She like nah, I ain't ready yet. Nah, I

ain't ready yet. I looked at her. I said, okay, I respect your decision. I got up. And she like — she got up. She put her pants on.

{¶24} While K.M. may have intended to stop prior to the point where D.L. took out his penis, and she felt that she expressed her desire to stop, we cannot conclude from the record that D.L. continued with sexual conduct knowing that K.M. wanted him to stop. According to K.M., the whole interaction transpired over two minutes. K.M. had second thoughts about progressing sexually with D.L. There was a delay in time from the moment she began to contemplate whether she should continue and when she verbally expressed her desire to stop. The testimony demonstrates that D.L. did in fact stop when K.M. expressed her desire for him to do so.

{¶25} Moreover, this case is not the situation where either K.M. or D.L. were under the influence of alcohol, substantially impaired, or impaired at all. Rather, K.M. and D.L. were two 17-year-old teenagers who were engaging in consensual sexual activity. They were boyfriend and girlfriend on a second date, which was after school at D.L.'s house. K.M.'s mother dropped her off at D.L.'s house and personally spoke with D.L.'s father, who was in the house and on the same floor as D.L. and K.M. When picked up by her mother, less than an hour and a half later, K.M. indicated that her time at D.L.'s house was fun, and did not tell her mother about what happened with D.L. K.M. only discussed the date with her mother three days later when she thought she might be pregnant and was nervous about how her parents would react. K.M.'s father was furious with her. He called D.L. about the incident, yelling at him. He told D.L., "I'm on my way to your house." He also said that his daughter is a virgin, to which D.L. replied,

"you're right, we didn't do [any]thing." D.L. felt as though K.M.'s father was forcing her to accuse him of rape. K.M.'s testimony as well as the SANE's testimony revealed that K.M. did not want to press charges against D.L.

{¶26} As the court stated in *In re Z.B.*, 9th Dist. Medina No. 09CA0039-M 2010-Ohio-1345:

> This Court acknowledges that a manifest weight challenge presents an appellate court with a narrow window of review, given the fact that the trier of fact is in the best position to determine the credibility of the witnesses. Yet, when faced with a case such as this, where the only witnesses to an alleged sexual attack were the victim and the accused, and the victim's credibility stands alone as the linchpin of the State's case, this Court cannot ignore its duty to sit as the "thirteenth juror" and review the evidence with a critical eye. *Thompkins*, 78 Ohio St.3d at 387. When viewed in its entirety, we cannot agree that the State presented the greater amount of credible evidence in this case. In weighing the evidence and all reasonable inferences, we conclude that, "in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the [adjudication of delinquency] must be reversed and a new trial ordered." [*State v. Otten*, 33 Ohio App.3d 339, 340, 515 N.E.2d 1009 (9th Dist.1986)].

*Id.* at ¶ 24, *discretionary appeal not allowed*, 126 Ohio St.3d 1547, 2010-Ohio-3855, 932 N.E.2d 340 (where the court found defendant's delinquency adjudication against the manifest weight of the evidence because the victim's testimony contained numerous discrepancies and was, at times, not believable. In addition, the victim's testimony was consistently impeached with evidence other than the juvenile's own testimony, including records of cell phone calls between the victim and the juvenile, the victim's statements to the police, and the testimony of the victim's friend.)

**{¶27}** We are aware that the facts of this case are sensitive. We are bound, however, to follow the law objectively and apply it justly. Here, we have a consensual encounter between two 17-year-old juveniles that ended after one of the participants communicated a desire to stop. "It is contrary to this court's basic understanding of the offense of rape to extend the definition of the offense to situations where two children so close in age engage in consensual intercourse." *In re Frederick*, 63 Ohio Misc.2d 229, 622 N.E.2d 762 (C.P. 1993). In *In re Frederick*, the defendant, a juvenile aged 14 years, was charged with rape under R.C. 2907.02(A)(1)(b) for engaging in sexual intercourse with the victim, aged 12. The trial court concluded that the application R.C. 2907(A)(1)(b) to the case as written would produce an unjust and absurd result. *Id.* at 234.

**{¶28}** Based on the foregoing, we find that the trial court's adjudication of delinquency is against the manifest weight of the evidence. After reviewing the entire record, weighing all of the evidence and considering the credibility of witnesses, we find that this is the exceptional case where the trial court "'clearly lost its way and created such a manifest miscarriage of justice that the [delinquency adjudication] must be reversed and a new trial ordered.'" *Thompkins,* 78 Ohio St.3d at 387, quoting *Martin*, 20 Ohio App.3d at 175.

**{¶29}** Accordingly, the sole assignment of error is sustained.

**{¶30}** Judgment is reversed, and the matter is remanded for a new trial.

It is ordered that appellant recover of appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, JUDGE

EILEEN A. GALLAGHER, P.J., and
MELODY J. STEWART, J., CONCUR