[Cite as *In re M.C.L.*, 2020-Ohio-3683.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ADAMS COUNTY

| | | |
|---|---|---|
| In the Matter of: | : | Case No. 19CA1099 |
| M.C.L. | : | <u>DECISION AND</u><br><u>JUDGMENT ENTRY</u> |
| | : | |
| | : | **RELEASED 7/02/2020** |

APPEARANCES:

Tyler E. Cantrell, Office of Young & Caldwell, LLC, West Union, Ohio, for appellant.

Kris D. Blanton, Adams County Assistant Prosecutor, West Union, Ohio, for appellee.

Hess, J.

{¶1} M.C.L. appeals the trial court's decision adjudicating him a delinquent child for sexual imposition in violation of R.C. 2907.06(A)(1). M.C.L. contends that his adjudication was against the manifest weight of the evidence because there was no evidence that offensive sexual contact occurred. He argues that the victim testified that M.C.L. had raped her, not that he had touched her breast. Moreover, even if the victim's testimony could be construed as evidence that an offensive sexual contact occurred, he cannot be adjudicated delinquent solely upon the victim's testimony unsupported by other evidence under R.C. 2907.06(B).

{¶2} We conclude that the trial court delinquency adjudication for sexual imposition was against the manifest weight of the evidence because the state presented no evidence that offensive sexual contact occurred. The victim denied that a consensual breast touching occurred and instead testified that she was raped. Even if we construe her testimony in a manner most favorable to the prosecution, her testimony alone is

insufficient to convict M.C.L of sexual imposition. We sustain M.C.L.'s first assignment of error and reverse the judgment. M.C.L.'s remaining assignments of error are moot.

## I. PROCEDURAL HISTORY

{¶3}   In March 2019, the state filed a complaint alleging that M.C.L. was a delinquent child because he had sexual conduct with the victim, T.O., by force or threat of force, in violation of R.C. 2907.02(A)(2), rape, a first-degree felony if committed by an adult. The complaint alleged that the rape occurred nearly two and a half years earlier in October 2016 when M.C.L. was 15 years old and T.O. was 14 years old.

{¶4}   The trial court held an adjudicatory hearing in May 2019, which produced the following evidence. The victim, T.O., testified that at the time of the hearing she was 17 years old and had just completed her junior year of high school. Several years earlier, when she was a freshman, she was friends with the appellant's sister, M.L.. On Friday evening October 28, 2016, she and M.L. took the school bus to M.L.'s house and the two had a sleepover. T.O. and M.L. were both 14 years old at the time of the sleepover and M.C.L. was 15 years old. T.O. was first introduced to M.C.L. after she and M.L. got off the school bus. T.O. described the layout of M.L.'s house as having two floors. M.L.'s bedroom, a small reception area, and M.L.'s bathroom were on the second floor and the first, main floor had a living room, kitchen, the parents' bedroom, M.C.L.'s bedroom and a bathroom that has two doors, one off the kitchen and one off of M.C.L.'s bedroom.

{¶5}   T.O. testified that evening she, M.L., M.C.L., and M.L.'s father went to the Maysville Wendy's, Kmart and a movie theatre.  In the car on the way home M.C.L. stroked T.O.'s arm.  After they returned home at approximately 11:00 p.m., T.O. sat with M.C.L. and talked to him for approximately two hours while he played video games on a

television immediately outside of M.L.'s bedroom. During that time M.L. and her father installed a new mattress in M.L.'s bedroom.  T.O. and M.L. went to bed at approximately midnight or 1 a.m. and M.C.L. went downstairs. After M.L. fell asleep, T.O. went downstairs to use the downstairs bathroom. T.O. explained that she could not use M.L.'s bathroom because M.L. was sleeping on the floor and T.O. would have tripped over her if she tried to use it.  After she went downstairs, T.O. saw M.C.L. playing video games in the living room so she joined him and talked to him for a few more hours. She said that during this second conversation M.C.L asked her if she would be his girlfriend and she said no because she did not want a relationship right now. T.O. said that at no point during either of their two conversations did either of them indicate any interest in sexual activity. T.O. testified that she and M.C.L. probably talked from approximately 2 or 3 a.m. to 5 a.m., then she went back upstairs and slept until approximately 8 or 9 a.m..

{¶6}    The next morning, after she and M.L. awoke, they went downstairs and ate donuts and M.C.L. joined them.  T.O. did not know where M.L.'s parents were and she did not see them between the time she awoke and the time she left with her mother at approximately 10 or 11 a.m.  After they finished their donuts, she and M.L. went outside to enjoy the sunrise and M.C.L. went to the living room and played video games.  T.O. left M.L. outside and went inside to use the bathroom. As she was sitting on the toilet, the bathroom door opened and she screamed, "I hear the door open and I, I explain really loudly because I, I think it's an accident, like he doesn't know someone's in the bathroom. * * * But then I start screaming because he, he's just open it more and more and more." Then T.O. testified that M.C.L. "opens the door, completely strips off his clothes. Then just he, he comes right for me" completely naked.  "He strips me. He, I tried to get away,

but I don't, I run into the bathtub well before I should say this, before the bathtub. He, he gets my shirt off. I wasn't wearing a bra. He gets my pants off. Then I get into the bathtub and he gets my underwear off."  T.O. testified that she said, "Please stop" and "punched him at one point."  "He, after he stripped me of all my clothing, he pins me down. My head is, I'm opposite of, of the faucet so my head doesn't hit anything, and my knees are up and my feet are flat on the ground. He gets on top of me and he inserts his penis into my vagina." She testified that she did not say anything to M.C.L. while this occurred and did not know how long it lasted.  T.O. testified that M.C.L. stopped at some point and got up and left and she got dressed and went back outside to M.L.  T.O. testified that she did not tell M.L. or anyone else that day because she was too scared.

{¶7}   T.O. testified that she told M.L. about the incident approximately a week later and she told M.C.L.'s and M.L.'s parents in 2017 in a school parking lot. In her direct testimony, T.O. stated that she did not tell anyone else until she wrote a personal narrative about it for an English assignment.  After T.O. wrote about it, the guidance counselor at the school told T.O.'s mother.  T.O. testified that she had spoken to M.C.L.'s parents about the rape in 2017 and not her own mother because, "I just felt more comfortable telling them."

{¶8}   During cross examination, T.O. identified the story she had written about the event and she stated that she wrote everything that happened and did not change things for the purpose of the assignment.  After re-reading her personal narrative, T.O. testified that several facts in it were incorrect. She had written that she had her first conversation with M.C.L. three or four hours after they all returned from Wendy's and Rural King, but she said it was probably about two hours.  She also clarified that Rural

King was currently located where the Kmart had been. T.O. also testified that in her story she wrote that she and M.C.L. "had six hours of engaging conversation" but in fact it was "like two."

{¶9}    In her narrative, T.O. described the alleged rape:

* * *As I was using the bathroom, the broken door slammed opened. I screamed, which would usually make a person go away. But Aafter [sic] [M.C.L.] had opened the door, he fastly and in a neat precise fashion closed the door. I started to scream for help frantically, but only to remember [M.C.L.'s] parents had both gone to work early in the mourning [sic] and that [M.L.] was outside right beside the illuminating trees getting fresh air. This was one moment that I was not in the slightest prepared for. I continued screaming and screeching and screaming and screeching the whole entire time. He lifted me off the toilet and slammed me down onto the hard tile floor, which contained fragments of glass. He continued to declothed [sic] me and started committing sexual acts. I tried with all my might to fight back and get out of the situation, but, nothing worked. It took twenty minutes, but it was finally over.

After all that terror, five minutes later my mom was thereir [sic] to pick me up. She asked me why I looked upset, and I told her the sunset was so beautiful it made me cry.

Two days later I went back to school. That day I told [M.L.] what happened, and later that evening she called me telling me that her parents don't believe that it was my fault, and that I appeared too feminine. * * *   (Def. Ex A)

{¶10} T.O. testified that she had written that M.C.L. "lifted me off the toilet and slammed me down on to the hard tile floor" when in fact he did not lift her off the toilet; she had tried to escape. T.O. also testified that she had been in that same bathroom the night before and she did not think the broken glass was on the bathroom floor then. She had written that she had told M.L. about it two days later, when she actually told M.L. a week later.  Although in her direct testimony, T.O. denied telling anyone other than M.L. and M.L.'s parents, during cross-examination T.O. testified that a male schoolmate of hers, M.C., talked to her about it at the time and she told M.C. that M.C.L. had raped her.

T.O. denied having a discussion with M.C. about any breast touching incident, claiming instead that M.C. was now changing his story.

**{¶11}** Adams County Investigator Kenneth Dick testified that he became involved in December 2018 and took photographs of the house where the alleged incident occurred. Investigator Dick did not interview T.O. or M.C.L., but he did conduct a five-minute interview of M.C. the male schoolmate, who told him that he thought the whole incident involved the consensual touching of breasts.

**{¶12}** For the defense, M.C.L.'s father testified about the layout of the house and stated that the walls were thin and a person could hear everything from anywhere in the house. Using bank statements to refresh his recollection, the father testified that on the evening of October 28, 2016, he took T.O. and his daughter to the store and to Wendy's in West Union. He did not believe he took them to a movie. The father testified that both he and his wife were at home the morning of October 29, 2016. According to the father, M.L. informed him that T.O. showed M.C.L. her breasts and asked him if he would like to touch them and M.C.L. touched them. The father said that when he learned this he called both T.O. and M.C.L. to discuss and his wife lead the discussion. The father said that M.C.L. told him that he and T.O. were talking while M.C.L. played a video game. Then T.O. and M.C.L. walked into the upstairs bathroom where T.O. raised her shirt, showed her breasts, and invited M.C.L. to touch them and he did. The father testified that he told M.C.L., "I said, well, first of all, that's unacceptable in my house we will not, we do not do that. I did tell him that it doesn't matter if a girl tells you to touch him, not you don't do that." The father testified that neither he nor his wife told T.O.'s mother about the incident when she came to pick T.O. up because T.O. asked them not to. T.O. explained that her

mother was going out of the country and T.O. did not want her mother to worry over it. T.O. told them that she and M.C.L. know better than to do it again and they were not going to be around each other. The father denied that T.O. told him that M.C.L. had raped her. Contrary to T.O.'s narrative, employment records from the father's employer showed that he was not at work the morning of October 29, 2016.

{¶13} On cross examination, the prosecutor pointed out that the bank records showed that M.C.L.'s father visited a Wendy's in Maysville, not West Union and that it appeared that he purchased movie tickets on Thursday night, October 27, 2016. The father conceded he may have bought movie tickets on Thursday for a Friday night movie. Also, when asked if T.O. ever told him and his wife that M.C.L. had raped her, the father responded, "not that I'm aware of," and that he first learned of the rape allegations when the complaint was filed.

{¶14} M.C.L.'s mother testified that she was employed as a nurse in October 2016 and her shift was from 3 p.m. to 11:30 p.m.. Contrary to T.O's narrative, employment records show that she was not at work the morning of October 29, 2016. The mother testified that she arrived home on October 29, 2016 at approximately 12:10 a.m. and her husband, M.L., T.O., and M.C.L were all there. The mother testified that she went to bed at approximately 2 a.m. and awoke at 9 a.m. She never heard any screaming or loud noises. The mother testified that that morning her daughter, M.L., informed her of an incident that occurred between T.O. and M.C.L. and she and her husband called them both into the living room for a discussion. The mother said that T.O. told her what happened and T.O. did not tell her that M.C.L. had raped her but instead described a

touching of "her boob." The mother testified that T.O. had asked her not to speak to T.O.'s mother about the incident.

{¶15}  M.L. testified that she and T.O. awoke about 9 a.m. the morning of October 29, 2016 and watched a movie in M.L.'s bedroom. M.L. went downstairs to get a snack for the two of them and was gone from the bedroom for approximately two minutes.  When she returned T.O. told her that M.C.L. had touched her breast.  M.L. said she immediately told her father what happened and he and her mother called both T.O. and M.C.L. down for a lecture. M.L. said that T.O.'s mother came to pick her up sometime after that and M.L.'s parents were both home when T.O.'s mother arrived.

{¶16}  Another classmate of T.O., B.O., testified that "out of nowhere" T.O. told her the next school day in the breakfast line that M.C.L. had touched T.O.'s breast and she seemed "kind of excited" and did not seem "that unhappy about it."

{¶17}  M.C., the male schoolmate of T.O. and friend of M.C.L., testified that he spoke to Investigator Dick and informed him that, to the best of his recollection, M.C.L. and T.O. had been involved in a consensual breast touching incident. M.C. testified that he spoke to T.O. about it in 2016 shortly after the incident and that M.C.L. had told him about the breast touching and that M.C. understood it to be consensual.

{¶18}  M.C.L. testified that in October 2016 he was in tenth grade and his sister was in ninth grade.  M.C.L. testified that in the morning of October 29, 2016, his sister and T.O. were watching a movie and he was outside her bedroom playing video games. M.C.L testified that after his sister went downstairs to get snacks, T.O. came out, sat down next to him, and started talking to him and flirting. Then he and T.O. walked into M.L.'s bathroom and T.O. asked him if he wanted to see her breasts and "at that age, uh, not

really thinking I just said yes. So, she pulled, um, took off her shirt willingly and she took off her bra and she asked me if I wanted to touch them and at that time, not knowing what I do now, I say yes, and I touched her right breast."

{¶19} M.C.L. testified that after that he left the bathroom and passed his sister on the way out of her bedroom. Then M.C.L. heard T.O. tell his sister about it and his sister immediately went down and told their father about it. He said that his father lectured them both, "we had a nice long discussion on how that was inappropriate and how we don't know each other, and this shouldn't be happening." M.C.L. testified that about an hour or two after the lecture, T.O.'s mother arrived and took her home.

{¶20} Following the adjudicatory hearing, the trial court determined that the state had failed to prove that M.C.L. raped T.O. The trial court found T.O.'s accusations about the alleged rape were not credible because someone at the house would have heard or seen something. The trial court also noted a number of discrepancies between T.O.'s testimony and her written statement and found that she had been given an opportunity to explain or correct a number of discrepancies but did not. However, the trial court found M.C.L. to be a delinquent child for sexual imposition, a third-degree misdemeanor under R.C. 2907.06(A)(1), based upon M.C.L.'s defense that consensual breast touching occurred:

> So, as far as the underlying charge or the original charges, the court cannot find beyond a reasonable doubt that the juvenile committed the act of Rape.
>
> The Court does, however [find] far beyond a reasonable doubt that the juvenile committed the act of Sexual Imposition. The Court finds that on or about, and between October the 28th and October, the 30th, 2016 in Adams County, Ohio, that [M.C.L.] did have Sexual Contact, touch of the breasts, which is a [sic] erogenous [zone] of the female. And that, um, the Court finds beyond reasonable doubt that [T.O.] was not the spouse of the offender. And that, uh, at the time of the commission of the offense that [M.C.L.] knew that the sexual contact was offensive

to the other person or was reckless in that regard, and that this occurred in Adams County, Ohio.(Tr. 238-239)

**{¶21}** M.C.L. appealed.

## II. ASSIGNMENTS OF ERROR

**{¶22}** M.C.L. assigns the following errors for our review:

1. The Juveniles [sic] adjudication was against the manifest weight of the evidence for adjudication of sexual imposition.

2. The Court erred in finding the Juvenile Delinquent of Sexual Imposition as the statute of limitations had expired for such a finding.[1]

3. The Court erred in using and considering information not presented at the trial.

4. The Court erred in placing restrictions on the Juvenile's sister.

## III. LAW AND ANALYSIS

### A. Manifest Weight of the Evidence

**{¶23}** For his first assignment of error, M.C.L. contends that the trial court's finding of delinquency for sexual imposition is against the manifest weight of the evidence because the state provided no evidence that any offensive sexual contact occurred. The State presented the testimony of T.O. who testified that she was raped in the downstairs bathroom and who denied that defense's version that her breast was touched in the upstairs bathroom. And, even if T.O.'s testimony could be construed to allege sexual imposition, he cannot be convicted solely upon the victim's testimony unsupported by other evidence.

### 1. Standard of Review

---

[1] At the conclusion of the oral argument, this court requested supplemental briefs on the statute of limitations issue raised in this assignment of error. Appellant filed a supplemental brief withdrawing his second assignment of error.

**{¶24}** Where a trial is not to a jury, a majority of the court may reverse a judgment. The requirement under Ohio Constitution, Article IV, Section 3 that a judgment reversed on the weight of the evidence be by the concurrence of all three judges is not applicable. *See In re D.L.,* 2016-Ohio-5834, 70 N.E.3d 1201, ¶ 17 (8th Dist.) (reversing a delinquency adjudication for rape) citing *State v. Gilkerson,* 1 Ohio St.2d 103, 104, 205 N.E.2d 13 (1965); *In re L.F.,* 9th Dist. Lorain No. 10CA09880, 2012-Ohio-302 (reversing delinquency adjudication for gross sexual imposition); *In re Z.B.*, 9th Dist. Medina No. 09CA0039-M, 2010-Ohio-1345 (majority reversal of a delinquency adjudication for rape).

**{¶25}** "[I]n the juvenile context we employ the same standard of review applicable to criminal convictions claimed to be against the manifest weight of the evidence." *In re Higginbotham*, 4th Dist. Lawrence No. 04CA26, 2004-Ohio-6004, ¶ 4, citing *In re Watson,* 47 Ohio St.3d 86, 91, 548 N.E.2d 210 (1989). In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119; *State v. Woods*, 2018-Ohio-4588, 122 N.E.3d 586, ¶ 64 (4th Dist.).

**{¶26}** "[U]nder *Thompkins,* even though there may be sufficient evidence to support a conviction, a reviewing court can still reweigh the evidence and reverse a lower court's holdings. Sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the

evidence addresses the evidence's effect of inducing belief." *State v. Wilson,* 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25 citing *Thompkins* at 386-87, 678 N.E.2d 541. "In other words, a reviewing court asks whose evidence is more persuasive— the state's or the defendant's?" *Id.* Although there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. *Id.* "[T]he civil-manifest-weight-of-the-evidence standard affords the lower court more deference then does the criminal standard." (Citations omitted.) *State v. Wilson,* 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 26. "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' " (Citations omitted.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541.

**{¶27}** "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." (Citations omitted.) *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. " 'However, this review is tempered by the principle that questions of weight and credibility are primarily for the trier of fact.' " *State v. Elkins*, 4th Dist. Lawrence No. 17CA14, 2019-Ohio-2427, ¶ 57, quoting *State v. Garrow*, 103 Ohio App.3d 368, 371, 659 N.E.2d 814 (4th Dist.1995).

**{¶28}** "If the prosecution presented substantial evidence upon which the trier of fact could reasonably conclude, beyond a reasonable doubt, that the essential elements of the offense had been established, the judgment of conviction is not against the manifest weight of the evidence." *State v. Elkins*, 4th Dist. Lawrence No. 17CA14, 2019-Ohio-2427, ¶ 57-58, citing *State v. Picklesimer*, 4th Dist. Pickaway No. 14CA17, 2015-Ohio-1965, ¶ 8. "Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs." *State v. Dyer*, 4th Dist. Scioto No. 07CA3163, 2008-Ohio-2711, ¶ 12; R.C. 2901.05 "A reviewing court should find a conviction against the manifest weight of the evidence only in the exceptional case in which the evidence weighs heavily against the conviction." (Internal quotations omitted.) *State v. Taylor*, 4th Dist. Ross No. 13CA3419, 2016-Ohio-1231, 62 N.E.3d 591, ¶ 31, quoting *State v. Thompkins*, 78 Ohio St.3d at 387.

### 2. Legal Analysis

**{¶29}** M.C.L. was adjudicated delinquent for committing sexual imposition in violation of R.C. 2907.06(A)(1), which provides in relevant part:

> (A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:
> (1) The offender knows that the sexual contact is offensive to the other person, or one of the other persons, or is reckless in that regard.
> * * *
> (B) No person shall be convicted of a violation of this section solely upon the victim's testimony unsupported by other evidence.

**{¶30}** O.R.C. 2907.01(B) defines "sexual contact" as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic

region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."

**{¶31}** To prove sexual imposition, the state was required to prove not only that sexual contact occurred, but that appellant "knows that the sexual contact is offensive to the other person * * * or is reckless in that regard." R.C. 2907.06(A)(1). Appellant does not dispute that sexual contact occurred. M.C.L. testified that he touched T.O.'s breast. Appellant's sister, appellant's mother and father, appellant's male friend, M.C., and T.O.'s former female friend, B.O., all testified that T.O told them that appellant had touched her breast. Appellant's sister testified that T.O. told her about it immediately after it happened. Appellant's parents testified that they understood that the touching was invited and consensual, that they lectured both T.O. and their son that such contact was not permitted in their house, and they did not tell T.O.'s mother about the incident because T.O. had asked them not to.

**{¶32}** Although sexual contact was undisputed, there was no evidence that M.C.L. knew the contact was offensive to T.O. or that he was reckless in that regard. Because the state was prosecuting a rape case, not a sexual imposition case, the only other evidence the state presented besides the victim's testimony were photographs of rooms in appellant's house and the testimony of an investigator, who testified that he did not interview T.O. or M.C.L. The investigator testified that he interviewed appellant's friend, M.C., who merely confirmed that he believed the whole incident was over the consensual touching of breasts. The investigator provided no testimony concerning whether the touching was consensual, whether appellant knew that the touching was offensive to

T.O., or that he was reckless in that regard. This other evidence failed to establish that M.C.L. knew that the sexual contact was offensive or that he was reckless in this regard.

{¶33} The six defense witnesses did not testify that M.C.L. knew the touching was offensive to the victim. Rather T.O.'s friend, B.O., testified that when T.O. told her about appellant touching her breast the day after it happened, she was "kind of excited," not "unhappy." M.C.L.'s friend, M.C., testified that appellant told him he touched T.O.'s breast and he understood from appellant that it was consensual.

{¶34} M.C.L. testified that he and T.O. were talking and flirting while he was playing video games. Then they both went into the bathroom and T.O. asked him if he wanted to see her breasts. "* * *at that age, uh, not really thinking I just said yes." T.O. removed her shirt and bra and asked appellant if he wanted to touch them, "and at that time, not knowing what I do now, I say yes, and I touched her right breast." Afterwards they left the bathroom, and appellant heard T.O. tell his sister about it. His sister immediately told their parents, who called T.O. and him both down for a "nice long discussion on how that was inappropriate and how we don't know each other, and this shouldn't be happening * * *."

{¶35} Two years after the incident, T.O. wrote a personal narrative for an English class in which she describes a rape. Authorities were notified and appellant was adjudicated delinquent. T.O.'s rape narrative differs significantly from her trial testimony. In her narrative, appellant's parents were away at work, not in the house during the rape. In her trial testimony, she did not know where appellant's parents were at the time of the rape. Her narrative: appellant lifted her off the toilet and slammed her down on the tile floor, which had broken glass fragments on it. Her testimony: she was in the bathtub and

appellant pinned her to the bathtub floor. Her narrative: the rape lasted twenty minutes. Her testimony: she did not know how long the rape lasted. Her narrative: she screamed and screeched the entire time. Her testimony: she screamed once when the bathroom door opened, but she did not scream during the incident. Her narrative: her mother arrived to pick her up five minutes after the rape occurred and asked her why she was so upset. Her testimony: her mother picked her up about a half hour later and they discussed nothing concerning the incident.

**{¶36}** T.O. reviewed her narrative and testified that it accurately represented the incident. The only material corrections she made to her narrative were: (1) in her narrative she stated that she and appellant "had six hours of engaging conversation" the evening before the incident and she testified that it was more like two to four hours; (2) her narrative incorrectly stated that appellant lifted her off the toilet and slammed her on the tile floor with glass fragments; instead she got up off the toilet to escape; and (3) her narrative states that she told appellant's sister about the incident two days later, when it was actually a week later.  T.O. denied that there was an incident in which M.C.L. touched her breast. She testified that she was raped, she told appellant's friend M.C. that appellant had raped her, and M.C. changed his story to a breast touching incident.

**{¶37}** The state's case was that a violent, prolonged rape occurred in the downstairs bathroom involving two completely naked teenagers that went unreported for over two years. The defense's case was that consensual breast-touching occurred in the upstairs bathroom, which was immediately reported to adults. In its decision, the trial court struggled with the discrepancies in T.O.'s narrative and her testimony and found that because appellant's parents were in the house at the time of the incident, they would

have heard T.O. scream if there had been a rape. Thus, it could not find beyond a reasonable doubt that appellant committed rape. Instead, the trial court found that based on appellant's testimony and that of appellant's sister, his mother, and his friend M.C., sexual contact – the touching of the breast – occurred.

**{¶38}** The trial court also found that "at the time of the commission of the offense that [appellant] knew that the sexual contact was offensive to the other person or was reckless in that regard * * * ." We find no evidence to support the finding that M.C.L. knew that touching T.O.'s breast was offensive to her or that he was reckless in this regard. The state's witnesses did not prove this element of the offense. T.O. denied it occurred and Investigator Dick's testimony did not establish this element of the offense. Appellant testified that the touching was invited and consensual; several other witnesses testified that appellant understood it to be invited and consensual. T.O. herself denied that it even occurred. Even when we construe her testimony in a manner most favorable to the prosecution, her testimony alone is insufficient to convict appellant of sexual imposition. *See* R.C. 2907.06(B) ("No person shall be convicted of a violation of this section solely upon the victim's testimony unsupported by other evidence.").

**{¶39}** The corroborating evidence necessary to satisfy R.C. 2907.06(B) need not be independently sufficient to convict the accused, and it need not go to every essential element of the crime charged. Slight circumstances or evidence which tends to support the victim's testimony is satisfactory. The corroboration requirement of R.C. 2907.06(B) is a threshold inquiry of legal sufficiency to be determined by the trial judge, not a question of proof, which is the province of the factfinder. *State v. Economo,* 76 Ohio St.3d 56, 60, 1996-Ohio-426, 666 N.E.2d 225.

**{¶40}** There was no testimony from any of the witnesses that the appellant knew the touching was offensive to T.O., nor was there any evidence that appellant was reckless in this regard – there was no testimony from other witnesses that T.O. was visibly upset or crying after the incident. *See State v. Franklin*, 4th Dist. Highland Nos. 05CA20, 05CA21, 2006-Ohio-6369, discussing *State v. Ervin,* 4th Dist. Jackson No. 551, 1987 WL 16087 (Aug. 25, 1987) (finding insufficient corroborating evidence under R.C. 2907.06(B)). T. O. denied there was an incident where appellant touched her breast, and all other witnesses testified that the touching was consensual and invited.

**{¶41}** The level of corroborating evidence need only be slight, but in this case it is nonexistent.

**{¶42}** Because the state failed to establish that appellant knew that the sexual contact was offensive or that he was reckless in this regard, we find that the trial court erred in adjudicating appellant delinquent for committing sexual imposition. We sustain appellant's first assignment of error and reverse the trial court's judgment.

**{¶43}** The remaining assignments of error are moot. *See* App.R. 12(A)(1)(c).

### IV. CONCLUSION

**{¶44}** We sustain M.C.L's first assignment of error, find his remaining assignments of error moot, reverse the judgment of the trial court, and remand for a new trial.

JUDGMENT REVERSED
AND CAUSE REMANDED.

Abele, J., dissenting:

**{¶45}** I respectfully dissent.  Here, the trial court judge, sitting as the trier of fact, waded through conflicting evidence and had the opportunity to fully observe and assess witness credibility.  Under the facts and circumstances in the case sub judice, the trial court determined that appellant committed the act of sexual imposition, if committed by an adult.

**{¶46}** I recognized that the prosecution's theory of the case is that the appellant forcibly raped the victim.  This theory comports with the victim's testimony.  Appellant, however, testified that he and the victim merely engaged in consensual sexual contact (with the victim's breast).  To that end, appellant's witnesses all testified that after the event, the victim spoke only about consensual sexual contact, not nonconsensual sexual conduct.  Consequently, the issue appears to center on whether the victim consented to the contact.  The trial court concluded, after hearing all of the evidence, that the victim did not consent to any activity.  In general, when weighing manifest weight of the evidence issues courts should consider and weigh all of the evidence produced at trial, including defense evidence.  *See State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212; *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 54; *State v. Getsy*, 84 Ohio St.3d 180, 1998-Ohio-533, 702 N.E.2d 866.  Again, in this case the appellant's theory of the case is that he engaged in consensual sexual contact with the victim.  The trial court, however, did not agree.

**{¶47}** Therefore, in the case sub judice I would defer to the trial court's assessment of the evidence that appellant committed the act of sexual imposition and affirm the trial court's judgment.

# JUDGMENT ENTRY

It is ordered that the JUDGMENT IS REVERSED and that the CAUSE IS REMANDED.  Appellee shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the ADAMS COUNTY COURT OF COMMON PLEAS, JUVENILE DIVISION to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted.  The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J.:  Concurs in Judgment and Opinion.
Abele, J.:  Dissents with Dissenting Opinion.

For the Court

BY:  _____
Michael D. Hess, Judge

# NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**